**2026 UT App 102**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ESTANISLO CANAL-MEDINA,
Appellant.

Opinion
No. 20220858-CA
Filed July 9, 2026

Third District Court, West Jordan Department
The Honorable William K Kendall
No. 201908937

Emily Adams, Freyja Johnson, and Hannah Leavitt-Howell, Attorneys for Appellant

Derek E. Brown and Rebecca Barker,
Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES GREGORY K. ORME and AMY J. OLIVER concurred.

LUTHY, Judge:

¶1 Estanislo Canal-Medina was convicted of one count of aggravated sexual abuse of a child. He now appeals, asserting that (1) his trial counsel (Counsel) provided ineffective assistance by failing to request that a juror be removed for cause and (2) the district court abused its discretion by admitting testimony regarding separate alleged incidents of child molestation by Canal-Medina. We affirm.

## BACKGROUND[1]

*The Abuse*

¶2 On August 9, 2020, Canal-Medina's wife (Grandmother) was cooking in the kitchen of their home while their grandchildren played in the living room. Canal-Medina was upstairs in the couple's bedroom watching television. One of Grandmother and Canal-Medina's daughters (Aunt) asked where one of the grandchildren, Gwen,[2] was. Gwen, who is autistic, was three years old at the time. Observing that Gwen was not in the living room with the rest of the grandchildren, Grandmother recalled that she had seen Gwen in the bedroom with Canal-Medina earlier in the day. So Grandmother went to the bedroom looking for Gwen.

¶3 The bedroom had two beds—Grandmother's and Canal-Medina's. The space between the beds was "a tight fit" that could be passed only by walking sideways. As Grandmother "very quietly" opened the door, she saw Gwen lying on her back on Grandmother's bed with the lower part of her legs hanging into the space between the beds. Gwen was holding up a coloring book with one hand and coloring in it with the other. Canal-Medina, "wearing just underwear," was standing "[i]n between" Gwen's legs. He had "opened her diaper to the side" and was holding his exposed penis in his hand, "trying to put it towards [Gwen's] vagina." Grandmother did not know if he was trying to "put it inside" her vagina or "perhaps just [trying to] . . . mak[e] his part

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Suhail*, 2023 UT App 15, n.1, 525 P.3d 550 (cleaned up).

2. A pseudonym.

touch her part." In either case, she thought it was "possible he was pretending to put it in her vagina."

¶4 Upon seeing this, Grandmother "yelled at" Canal-Medina and called for Aunt. Aunt "came running upstairs and . . . asked what had happened." Grandmother said, "Your dad was doing something to the girl." Aunt "started crying and grabbed [Gwen] and ran out with her." Soon Aunt returned to the bedroom and asked Canal-Medina, "What were you doing to her?" Canal-Medina responded, "No, I wasn't doing anything. I was just standing up because I was going to the bathroom." He then "put on some shorts, sandals, and a shirt" and left the house to buy cigarettes. While he was gone, the family called the police.

¶5 When Canal-Medina returned a short time later, Grandmother again "yell[ed] at him," saying, "I know what I saw." Canal-Medina replied that she was "just making stuff up," that he had simply been "getting up to go to the bathroom," and that she "didn't see anything." At about this time, the police arrived at the house and arrested Canal-Medina.

*Detective's Interview of Canal-Medina*

¶6 Two days later, Canal-Medina was interviewed by a detective (Detective) with the assistance of an interpreter. Canal-Medina told Detective that when Grandmother saw him, he was trying to get past Gwen so he could smoke a cigarette and that "in the process of scooting over between the two beds, he had to move [Gwen's] legs out of the way." Canal-Medina disputed Grandmother's report that he was wearing only his underwear when she saw him. He also said, in contrast to Grandmother's account, that Gwen was lying on her stomach, but he admitted that he "was facing [Gwen]." When asked "about his penis [having been] out," he responded, "I don't know why my penis was out."

*Canal-Medina's Motion in Limine*

¶7     Canal-Medina was charged with one count of aggravated sexual abuse of a child. Prior to trial, the State filed a notice of its intent to present evidence under rule 404(c) of the Utah Rules of Evidence that Canal-Medina had committed other acts of child molestation. Specifically, the State said that it intended to offer testimony from a girl, Mary,[3] who was Canal-Medina's neighbor and who lived with her mother in Canal-Medina's sister's house. The State said that Mary would testify that on at least four occasions over six years—from when she was about three years old to when she was about nine years old—Canal-Medina took her into a shed, removed her pants, unzipped his pants, and then "touch[ed] [her] breasts" and "put his penis on [her] bottom." Canal-Medina filed a motion in limine asking the court to exclude Mary's testimony.

¶8     Following oral argument on Canal-Medina's motion, the court ruled that the State's proposed evidence was admissible. The court reasoned that "[t]he plain language of [rule] 404(c) indicates that the [c]ourt may admit evidence that the defendant committed any other acts of child molestation to prove a propensity to commit the crime charged," adding that the rule is "very broad." The court acknowledged that Canal-Medina's alleged molestation of Mary was not "exactly the same" as his alleged abuse of Gwen, but it determined that there was no requirement that the incidents be "the same or even substantially similar" for Mary's testimony to be admissible. It further reasoned that, in any event, "[t]here [were] similarities" between the alleged incidents "in terms of the age of the victim[s], the sexual acts, and the fact that . . . these [were] crimes of opportunity." The court also determined that Mary's testimony was admissible under rule 403 of the Utah Rules of Evidence because it was not

---

3. A pseudonym.

unfairly prejudicial and its probative value was not substantially outweighed by a danger of unfair prejudice.

*Jury Selection*

¶9     The case proceeded to trial. During jury selection, Counsel asked for some "follow-up" with a prospective juror (Juror 14), who had indicated on his jury questionnaire that he was "related to law enforcement." When the court asked Juror 14 to provide "a little more information on that," he explained that his daughter worked for Adult Probation and Parole (AP&P) at the state prison. The court asked whether Juror 14 "talk[ed] shop" with his daughter "about criminal cases or trials or anything like that." Juror 14 replied that his daughter "always ha[d] an opinion" and talked to him about "not . . . particular criminals, but . . . different types of criminals and how they are the worst people on earth and stuff like that." He added, "She's pretty ingrained in her job, just take them out and shoot them."

¶10     When the court asked Juror 14 if "those discussions" with his daughter would "cause [him to have] a concern about being fair and impartial," Juror 14 said, "No." Elaborating and using "abuse prisoners . . . that were convicted" as an example, Juror 14 said that although his daughter had "a very low opinion of them . . . and expresse[d] it," he thought the court's comment "in [its] opening remarks . . . that truly our constitutional foundation is [that] a person is innocent until proven guilty" was "excellent." Juror 14 said, "I deeply believe that." Juror 14 also agreed with "the added aspect" that a juror "need[s] to evaluate [the case] based upon the things that the attorneys present and [the juror's] judgment."

¶11     After saying it was "glad to hear that," the court posed a follow-up question: "So were you to be in the position of the prosecution [or] the defense in this case, do you feel that you would be satisfied to have a juror with your attitude and frame of mind serve as a member of the jury panel?" Juror 14 responded,

> You know, knowing myself, I would say no, you would be way off. No. Let me just add a comment to the things that you'd said. That is when you talked about the nature of the sexual aspect of abuse[.] . . . I suppose I'm kind of a prude, but it makes me very anxious that this kind of behavior goes on in our community. And so it wasn't the kind of concern that I wouldn't be impartial or fair. I believe I will be. But that is a very trying thing.

> You know, when you're talking about the nature of that and the process of the court, . . . I believe it's happening. I appreciate your comments on that as well. It is a part of the case. So . . . I feel good about being able to be non-biased and impartial.

The court then asked Juror 14 if he "could set aside those . . . insecurities or anxiousness . . . as best [he] could at least and be a fair and impartial juror and render a true and just verdict based upon the facts, . . . the evidence, and the law that [the court would] give." Juror 14 said, "Yes." Counsel indicated he had no further questions, and he did not challenge Juror 14 for cause or use a preemptory challenge to have him excluded. Juror 14 was ultimately selected to sit on the jury.

*The Trial*

¶12 The State called Grandmother, Gwen's mother, and Detective as witnesses at trial. They testified to the facts set forth above regarding Canal-Medina's abuse of Gwen and law enforcement's response.

¶13 Grandmother also testified that after witnessing the abuse, she "told [the police] everything." On cross-examination, she denied having said at the preliminary hearing that she saw Canal-Medina "rubbing the front part of [Gwen]"; instead, she said that

she only saw him "trying . . . to touch it." She further characterized her signed statement for the police as saying—despite Counsel's suggestion otherwise—that she had seen Canal-Medina's penis only "coming very close" "to the private part of the girl." The defense then played a portion of a video of Grandmother's interview with Detective, wherein Grandmother told Detective that Canal-Medina's penis did not "actually go inside [of Gwen] because [Gwen] would have been injured" but that "it was touching" her "vagina"—"[o]n and off, on and off." When confronted by Counsel with the discrepancy between her trial testimony that she saw Canal-Medina only trying to touch Gwen's vagina with his penis and her earlier statement wherein she "said definitively that there was touching," Grandmother testified,

> A.     So I mean, I don't know how to explain it. It's not like he put it inside, but if he didn't touch it, he was almost touching it.
>
> Q.     Was he touching the outer parts of her vagina?
>
> A.     Not exactly.
>
> Q.     But you have previously said that he was?
>
> A.     Yes, but I didn't explain it correctly. I mean . . . [it] is kind of like you are going to like put it in. . . .
>
> Q.     But when you were talking to the detectives, you made a motion with your hand. You held out one hand and held out your finger and you repeatedly touched your hand with the finger . . . ; correct?
>
> A.     Yes. I did say that but . . .

(Final ellipsis in original.)

¶14   The State also called a forensic nurse and two DNA analysts. The nurse testified that she examined Gwen, found no injuries, and collected DNA swabs from Gwen's body. After the DNA analysts testified, the parties agreed on a jury instruction stating that the parties had stipulated (1) that male DNA from three or more individuals was found on Gwen's inner-thigh swab and on her diaper, (2) that Canal-Medina could not be excluded as a contributor to the DNA on Gwen's inner-thigh swab, (3) that the Y-chromosome profile from Gwen's inner-thigh swab was 133 times more likely to have come from Canal-Medina or one of his paternal blood relatives than from an unrelated male in the United States, (4) that the DNA from Gwen's inner-thigh swab was not seminal fluid or saliva, and (5) that the DNA on Gwen's diaper could not be linked to Canal-Medina.

¶15   Finally, the State called Mary, who was a teenager at the time of trial. She testified that Canal-Medina touched her "in a sexual way" when she was "between the ages of maybe 6 and 8." She said that this touching happened "[e]very time he was over." She explained that Canal-Medina would pull her into a "little room . . . next to [their] garage," "lift up [her] shirt," and touch her breasts. Mary testified that he also "stroked [his penis] on [her] butt." She said she knew it was his penis because she "heard [him] unzip his pants and then his belt." Mary testified that after the last time Canal-Medina touched her, she told her mother what had happened and that they talked about it with Canal-Medina's sister. Mary explained that "[i]t was decided" not to report the molestation and that Canal-Medina did "not come around the house anymore after that."

¶16   The jury was instructed on the charged offense of aggravated sexual abuse of a child and the lesser-included offense of attempted aggravated sexual abuse of a child. Regarding Mary's testimony, the jury was instructed as follows:

> You have heard testimony from a witness, [Mary], who has alleged [Canal-Medina] molested her when she was a child. These allegations are not the basis for the charges in this case. They are only to be considered in the context of the evidence introduced in this case as a whole in determining [Canal-Medina's] propensity to commit similar offenses, such as the charged offenses in this case.
>
> You may not convict [Canal-Medina] of the crimes charged simply because you find that he committed these other acts, or that he had a character trait that predisposed him to commit the crimes charged. Evidence of these acts does not lessen the State's burden to prove [Canal-Medina's] guilt in this case beyond a reasonable doubt.

¶17 The jury found Canal-Medina guilty of aggravated sexual abuse of a child. Canal-Medina now appeals.

ISSUES AND STANDARDS OF REVIEW

¶18 Canal-Medina contends that Counsel was ineffective for failing to request that Juror 14 be removed for cause. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Reid*, 2018 UT App 146, ¶ 17, 427 P.3d 1261 (cleaned up).

¶19 Canal-Medina also asserts that the district court abused its discretion by admitting Mary's testimony under rules 403 and 404(c) of the Utah Rules of Evidence. "We afford district courts a great deal of discretion in determining whether to admit or exclude evidence and will not overturn an evidentiary ruling absent an abuse of discretion." *State v. Cuttler*, 2015 UT 95, ¶ 12,

367 P.3d 981 (cleaned up). "But whether the district court applied the proper legal standard in assessing the admissibility of that evidence is a question of law that we review for correctness. And the admission or exclusion of evidence under the wrong legal standard constitutes an abuse of discretion." *Id.* (cleaned up). "A trial court also abuses its discretion under rule 403 if its decision to admit or exclude evidence is beyond the limits of reasonability." *Id.* (cleaned up).

## ANALYSIS

### I. Ineffective Assistance of Counsel

¶20    Canal-Medina asserts that Counsel rendered ineffective assistance by failing to ask the court to remove Juror 14 for cause. "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components. First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "The first prong of [this] *Strickland* standard further requires that a defendant rebut the strong presumption that under the circumstances, the challenged action might be considered sound trial strategy." *State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92 (cleaned up).

¶21    In *Litherland*, our supreme court explained that "[i]n the context of jury selection, the *Strickland* standard requires the appellate court to make two distinct presumptions when trial counsel does not object to, or remove, a particular juror":

> First, trial counsel's lack of objection to, or failure to remove, a particular juror is presumed to be the product of a conscious choice or preference. This follows from the general presumptions imposed by *Strickland* and from the fact that a conscious refusal

> to object to or remove a particular juror may be manifested by nothing more than silence in many circumstances. Second, because the process of jury selection is a highly subjective, judgmental, and intuitive process, trial counsel's presumably conscious and strategic choice to refrain from removing a particular juror is further presumed to constitute effective representation.

*Id.* ¶ 20. In short, "the decision not to remove a particular juror need only be plausibly justifiable, and such plausible justifiability is ordinarily presumed." *Id.* ¶ 25.

¶22 "Of course, the *Strickland* presumption of effectiveness is not irrebuttable." *Id.* And in this context, a defendant can rebut the presumption by showing (1) "that defense counsel was so inattentive or indifferent during the jury selection process that the failure to remove a prospective juror was not the product of a conscious choice or preference," (2) "that a prospective juror expressed bias so strong or unequivocal that no plausible countervailing subjective preference could justify failure to remove that juror," or (3) "that there is some other specific evidence clearly demonstrating that counsel's choice was not plausibly justified." *Id.* (cleaned up).

¶23 Here, Canal-Medina attempts the second method for rebutting the presumption that Counsel's decision not to challenge Juror 14 was plausibly justified. Specifically, he contends that Juror 14 "expressed bias so strong or unequivocal that no plausible countervailing subjective preference could justify [the] failure to remove" Juror 14. (Quoting *id.*) Canal-Medina asserts that Juror 14 expressed such bias when he (1) recited "his daughter's strong opinions that criminals are 'the worst people on earth' and [that] . . . it would be appropriate to 'just take them out and shoot them'"; (2) explained that because he is "kind of a prude," "it makes [him] very anxious that [sexual

abuse] goes on in our community" and that hearing about such abuse would be "a very trying thing"; and (3) responded to the question of whether—if he were the prosecutor or defense counsel—he "would be satisfied to have a juror with [his] attitude and frame of mind" by initially saying, "You know, knowing myself, I would say no, you would be way off. No." Canal-Medina's argument is unavailing.

¶24   First, to be sure, Juror 14's daughter's reported views regarding prison inmates are troubling. And Canal-Medina argues that Juror 14's recitation of his daughter's views without explicitly "denounc[ing]" them "showed that Juror 14 believe[d] that criminal cases or trials involve criminals," suggesting that Juror 14 could not properly apply the presumption of innocence. But in recounting his daughter's views, Juror 14 stated that her "very low opinion" was of "abuse prisoners . . . *that were convicted*," not that she had such an opinion of persons who had only been charged. (Emphasis added.) More importantly, Juror 14 deliberately distanced himself from his daughter's views by going on to explain that he "deeply believe[d]" that the presumption of innocence is "truly our constitutional foundation"; that the court's explanation of that principle was "excellent"; and, further, that he believed that jurors need to evaluate cases based on the evidence presented. Accordingly, Juror 14 expressly disavowed any notion that defendants are inherently guilty because they are on trial. And particularly given Counsel's privileged position of having been present in the courtroom, we defer to Counsel's determination to apparently credit Juror 14's expression of his personal views regarding the presumption of innocence over his recitation of his daughter's reported troubling views of convicted criminals. *See id.* ¶ 21 ("A prospective juror's demeanor, interaction with others in the courtroom, and personality in general may all play an important role in providing clues as to that juror's likely predilections toward the case at hand.").

¶25     Second, Canal-Medina contends that Juror 14's expression of anxiety regarding the existence of sexual abuse in the community and the "very trying" nature of having to sit on a case involving sexual abuse allegations "made plain that he was already biased to believe the State's witnesses claiming that [Canal-Medina] had sexually abused Gwen." However, Juror 14's comments did not express a belief that anyone charged with a sexual crime must be guilty. *Cf. State v. Taylor*, 2025 UT App 14, ¶¶ 21–22, 564 P.3d 962 (holding that a juror with law enforcement experience in sexual abuse cases who said that he had "'never had any cases that were factually innocent' . . . resulted in a presumption of bias" (cleaned up)). And "an attorney may make a reasoned judgment that a prospective juror's consciousness of, and concern for, his or her own potential bias"—and in this case, a consciousness of, and concern for, his or her anxiety regarding the type of crime with which the defendant is charged—"actually provides a more sure foundation for confidence in that juror's reasoning processes." *State v. Litherland*, 2000 UT 76, ¶ 22, 12 P.3d 92. Given this, we are not persuaded that Juror 14's anxiety was evidence of a "bias so strong or unequivocal that no plausible countervailing subjective preference could justify failure to remove that juror." *Id.* ¶ 25.

¶26     Finally, Canal-Medina asserts that the "most significant indicator of Juror 14's bias was his response to the question, '[W]ere you to be in the position of the prosecution [or] the defense in this case, do you feel that you would be satisfied to have a juror with your attitude and frame of mind serve as a member of the jury panel?'" Canal-Medina notes that Juror 14's "automatic and first response"—which, admittedly, on the face of the transcript appears problematic—was, "You know, knowing myself, I would say no, you would be way off. No." Yet our supreme court has acknowledged both that a "transcript reveals nothing about the juror's demeanor or other intangible characteristics that constitute the collage of attributes attorneys assess in choosing jurors," *id.* ¶ 24, and that "an attorney's

decisions regarding jury selection may . . . appear counterintuitive, particularly when viewed from the perspective of a bare transcript on appeal," *id.* ¶ 22 (cleaned up). These principles apply here.

¶27 We have not only read the transcript of Juror 14's individual voir dire; we have listened to a recording of it. The recording confirms that immediately following his foregoing answer, Juror 14 let out an audible chuckle, the tone of which permitted the possibility, if not probability, that Juror 14 meant to convey not merely "No" at the end of his answer but an unspoken "I'm just kidding." In other words, as the State contends, the recording suggests that Juror 14 may have been "joking about not wanting a juror with his mindset impaneled." Here again, we acknowledge Counsel's privileged position for reading unspoken cues in the courtroom and determining whether Juror 14's identified response was an innocuous attempt at self-deprecating humor or a truly problematic expression of actual bias. *See id.* ¶ 21. Accordingly, we conclude that in this instance as well, Juror 14 did not "express[] bias so strong or unequivocal that no plausible countervailing subjective preference could justify failure to remove" him. *Id.* ¶ 25.

¶28 In sum, Canal-Medina has not rebutted the presumption of reasonableness afforded Counsel's decision to not request that Juror 14 be removed for cause. Therefore, Canal-Medina's ineffective assistance of counsel claim fails.

## II. Rules 403 and 404(c) of the Utah Rules of Evidence

¶29 Canal-Medina also asserts that the district court abused its discretion by admitting Mary's testimony because (1) "the acts Mary alleged were not sufficiently similar [to Canal-Medina's alleged abuse of Gwen] to show that [Canal-Medina] had a propensity to commit the charged crime[]" and (2) the risk of unfair prejudice from Mary's testimony substantially outweighed its probative value. Again, we are not persuaded.

¶30    Rule 404(c) of the Utah Rules of Evidence provides in relevant part that "[i]n a criminal case in which a defendant is accused of child molestation, the court may admit the following evidence to prove propensity to commit the crime charged: . . . evidence that the defendant committed any other acts of child molestation." Utah R. Evid. 404(c)(2). "Child molestation" is defined under the rule as "an act committed in relation to a child who is younger than 14 years old that would, if committed in this state, be a sexual offense or an attempt to commit a sexual offense." *Id.* R. 404(c)(1).

¶31    The State alleged that Canal-Medina "attempt[ed] to put his penis into [Gwen's] vagina." It then offered for admission under rule 404(c) Mary's proffered testimony that when she was between the ages of about three and nine, Canal-Medina touched her breasts with his hands and her buttocks with his penis. Canal-Medina asserts that these incidents are not sufficiently similar because the alleged sexual acts were different and because the State did not "prove that the ages of Mary and Gwen were similar." But Canal-Medina is insisting on a level of similarity not required by the rule. Indeed, the plain text of the rule states that when a criminal defendant is accused of child molestation, evidence of "*any other acts* of child molestation" is admissible to prove "propensity to commit the crime charged." *Id.* R. 404(c)(2) (emphasis added). Here, the State proffered evidence that Canal-Medina committed child molestation of Mary, and Mary's actual testimony at trial conformed to that proffer. That is all that was required under rule 404(c)(2).

¶32    Canal-Medina points to *State v. Cuttler*, 2015 UT 95, 367 P.3d 981, in support of a contrary conclusion. He observes that in *Cuttler*—where the supreme court reversed the district court's exclusion of other-acts evidence under rule 404(c)—the defendant was charged with committing sexual acts against his youngest daughter that were nearly identical to acts he had allegedly committed against his older daughters several years earlier,

namely, vaginal rape and oral and anal sodomy. *See id.* ¶¶ 1–2. However, as the State aptly observes, "While the acts held to be admissible in *Cuttler* were exceptionally similar, that does not imply that *less* similar acts *are not* admissible." Thus, Canal-Medina's citation of *Cuttler* does not change our rule 404(c) analysis.

¶33 Canal-Medina also asserts that Mary's testimony was inadmissible under rule 403 of the Utah Rules of Evidence because its probative value was substantially outweighed by the danger it posed of unfair prejudice. Specifically, he contends that the evidence against him was "weak because it rested solely on [Grandmother's] equivocal statements" and, thus, that "there was a substantial risk that the jury would not merely consider Mary's allegations for propensity but would rely on them to decide that [Canal-Medina] should be punished because he sexually abused Mary, even if [the jury] was uncertain what, if anything, [he] did to Gwen." We reject this argument.

¶34 The evidence at trial other than Mary's testimony was related directly to Canal-Medina's abuse of Gwen, and that evidence was not weak. Grandmother witnessed Canal-Medina's abuse of Gwen firsthand and provided her eyewitness testimony to the jury. Grandmother was largely consistent over time in recounting the abuse in her written statement to police, her interview with Detective, her preliminary hearing testimony, and her trial testimony. Although at trial she was no longer willing to say that she saw Canal-Medina's penis touch Gwen's vagina, Grandmother was never equivocal regarding the fundamental nature of what she saw—namely, Canal-Medina standing in front of Gwen, holding his penis, and pushing it toward Gwen's exposed genitals in a manner that could be described as "pretending to put it in her vagina." Additionally, Detective testified that when Canal-Medina was asked "about his penis being out," he responded, "I don't know why my penis was out," rather than denying that his penis had been exposed or providing

some innocuous reason why it had been exposed. In short, the evidence other than Mary's testimony fully supported that Canal-Medina committed aggravated sexual abuse of Gwen by taking "indecent liberties" with her. *See generally* Utah Code §§ 76-5-401.1, -404.1, -404.3 (defining aggravated sexual abuse of a child to include an actor occupying "a position of special trust in relation to the child" "tak[ing] indecent liberties with [the] child whether over or under the clothing," and defining "[i]ndecent liberties" to include "simulating or pretending to engage in sexual intercourse with another individual"). Moreover, the jury was specifically instructed that "[Mary's] allegations [were] not the basis for the charges in this case" and that it could "not convict [Canal-Medina] of the crimes charged simply because [it found] that he committed [the] other acts [against Mary]." *See generally State v. Nelson*, 2011 UT App 107, ¶ 4, 253 P.3d 1094 ("We generally presume that a jury will follow the instructions given it." (cleaned up)); *State v. Toki*, 2011 UT App 293, ¶ 33, 263 P.3d 481 ("Our judicial system greatly relies upon the jury's integrity to uphold the jury oath, including its promise to follow *all* of the judge's instructions." (cleaned up)).

¶35 Given the strength of the evidence apart from Mary's testimony of Canal-Medina's abuse of Gwen and the jury instructions specifically addressing the proper use of Mary's testimony, we believe it highly likely that the jury used the rule 404(c) evidence for its proper purpose: namely, as suggestive of Canal-Medina's propensity to commit offenses like the ones charged in this case and, thus, supportive of the allegation that Canal-Medina sexually abused Gwen. Correspondingly, we see little danger that the jury convicted Canal-Medina solely for engaging in the uncharged conduct of assaulting Mary.

¶36 For the foregoing reasons, the district court did not abuse its discretion in admitting Mary's testimony under rules 403 and 404(c) of the Utah Rules of Evidence.

CONCLUSION

¶37 Canal-Medina's ineffective assistance of counsel claim fails because he has not rebutted the presumption that Counsel acted reasonably when he did not seek to remove Juror 14. Additionally, Canal-Medina has not demonstrated that the district court abused its discretion by admitting Mary's testimony under rules 403 and 404(c) of the Utah Rules of Evidence. Accordingly, we affirm Canal-Medina's conviction.

---